IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ESTALIN MENDOZA NOLASCO,

    Petitioner,                                  No. CIV S-03-0572 FCD CMK P

    vs.

DAVID RUNNELS, et al.,

    Respondents.                        FINDINGS AND RECCOMENDATIONS

/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his amended petition filed August 15, 2003, petitioner challenges his conviction on several grounds.

**I.    FACTS**

        Petitioner shot and killed Manuel Alvarado on the night of January 22, 1998. Petitioner's defense was that he met Alvarado to purchase drugs and that he killed Alvarado in self-defense when the two began arguing about whether petitioner owed Alvarado money for previous drug transactions. A jury trial was held in 1998 in the Sacramento County Superior Court. The jury did not accept petitioner's defense and found petitioner guilty of first degree murder during the commission of an attempted robbery with personal use of a firearm inflicting great bodily injury. (RT at 1704-07, 1727-29.) On August 20, 1999, petitioner was sentenced to state prison for the term of life without possibility of parole, plus additional

consecutive terms.  (Id.)

The prosecution introduced evidence at trial which tended to establish the following.  On January 22, 1998, petitioner was free from custody after posting $130,000 bond on two pending charges.  Early that day, petitioner was in court because his trial was scheduled to begin.  The prosecution refused to plea bargain with petitioner, and petitioner faced fourteen years in prison if he went to trial.  The prosecutor agreed to a request from petitioner's then-attorney John Duree to postpone petitioner's trial for four weeks to consider defense information. (RT at 165-70-174-77.)

Later in the day, petitioner told his friend, Stacie Davis, that he would go to jail for a long time unless he could obtain money to pay his attorney to defend him against the two pending charges.  Davis recounted this statement at the preliminary hearing in this case. Petitioner's attorney fees to Duree amounted to several thousand dollars, and petitioner's source of income was narcotics trafficking.  (RT at 536-38, 570, 603-04, 920, 986-87.)

That night, shortly after 7:00 p.m., petitioner met Alvarado near petitioner's home.  Petitioner killed Alvarado while Alvarado sat in his idling Jeep Cherokee.  Petitioner inflicted blunt force and sharp force injuries to Alvarado's face and body.  From outside the driver door of the Jeep, petitioner fired six to eight gunshots into Alvarado's body.  (RT at 179-84, 193-95, 250, 268, 294, 323, 330-37, 343, 345, 357, 372-76, 380-81.)

Petitioner moved Alvarado's body to the passenger side and drove the Jeep away from the scene, eventually crashing it into a tree across from Prairie Elementary School. Petitioner got out of the vehicle, leaving the door open, and ran approximately 440 feet to his friend, Stacie Davis's, house.  Petitioner tapped on Davis's window, and she opened the window to let him inside.  Before Petitioner entered, he told Davis, "I just killed somebody."  Petitioner used Davis's bathroom to clean blood from his face and threw the bloodied towel in the trash. Petitioner asked Davis to drive him to the home of his girlfriend, Michelle Hutchings.  As Davis was driving petitioner to Hutchings's home, petitioner told Davis that, as he had attempted to rob

Alvarado, a struggle had ensued, and petitioner shot Alvarado repeatedly. Before Davis drove away after dropping petitioner off at Hutchings's home, she saw petitioner discard his jacket in a trash receptacle. (RT at 197-98, 217, 20, 199-201, 207, 211, 281-82, 308-09, 402-20, 447-48, 471, 473, 522, 636.)

Sacramento Police Officer Mitchell Paterson responded to Prairie Elementary at about 7:30 p.m and saw the crashed Jeep on Meadow Parkway; the Jeep's engine was still running. Alvarado's body was in the passenger seat, slumped over. The driver window was recessed and a gold chain was in the window track. Petitioner's watch was in the driver's seat. None of petitioner's fingerprints were in the Jeep. Police found $2,000 cash in Alvarado's left front pocket and $97 in his right front pocket. Additional cash in the amount of $485 was found in a pouch on the floorboard behind the passenger seat. Also in the pouch were Alvarado's credit cards and business cards. In a shopping bag behind the driver's seat were two one pound packages of methamphetamine. Alvarado's pager was also found. Petitioner had paged Alvarado twice at 6:24 p.m, including in the second page a "4000" notation, which apparently means $4,000. Using a cellular phone, petitioner called Alvarado at 6:59 p.m. (RT at 200, 212, 238-43, 250, 258-59, 270-72, 295, 309, 676-78, 272-77.)

Davis testified that, when she returned from taking petitioner to his girlfriend's house, she walked down the street and watched the emergency vehicles that were responding to Prairie Elementary. Davis stated that, as she walked home, she felt sick. When she returned home, she used a towel to wipe petitioner's fingerprints off her bedroom window and cleaned a footprint that he left on her bed when he entered the house through the window. (RT at 426-28.)

Later that night, petitioner called Davis's home to speak with her. Because Davis was not available, petitioner spoke with Davis's mother, Shelly Goodnight. Petitioner questioned Goodnight about the activities taking place on the street, which was the same street where petitioner had crashed the Jeep with Alvarado's body in it. Petitioner told several other friends that night that he had paged Alvarado that night but could not reach him. Petitioner

stated that he had no idea about Alvarado's murder, denied any involvement in the murder, and denied killing anyone. (RT at 591-99, 976, 996.)

The morning after the shooting, petitioner contacted Davis and asked her to come to his home to talk. Davis complied, and she also drove petitioner to and from a local shop where petitioner purchased a local paper. Upon returning from visiting with petitioner, Davis told her mother that petitioner's victim had been a "big, rich dope dealer" to whom petitioner owed money. Davis further told her mother that petitioner had attempted to rob the victim, that he and the victim had fought, and that petitioner had shot the victim several times. Later that night, petitioner visited Davis at the home of her boyfriend James and told Davis to be quiet about the events of the previous night. (RT at 430-34, 596-97, 437-39.)

On January 25, 1998, police officers brought Davis to the police station for questioning. Davis stated that she initially planned to give police as little information as possible, but officers informed her that she could be arrested as an accessory to murder after the fact. On the videotaped recording of the interview, at timestamp 7:50:41 p.m., Davis indicated that she did not want to speak to the police because she feared that harm would come to her family. After more questioning, Davis stated that while petitioner was in her home immediately after the killing, petitioner admitted that the killing resulted because he was going to "jack"[1] Alvarado. (RT at 474-75, 479, Lodged Videotape 98-6244.)

Petitioner was arrested on January 26, 1998. During a police interview on January 26, 1998, petitioner's girlfriend, Michelle Hutchings, truthfully recounted what she knew about the events of January 22, 1998, as well as what petitioner had told her. In a later conversation with petitioner, Hutchings admitted faking tears during the interview. The next day, January 27, 1998, Hutchings obtained $4,000 belonging to petitioner from his sister and delivered it to Duree, petitioner's then-attorney. (RT 633, 773, 734-35, 762, 686-87, 771.)

---

[1] "Jack" is a slang word for rob.

4

Petitioner telephoned Davis more than once while he was incarcerated after his arrest for Alvarado's murder. During at least one of the calls, petitioner directed Davis to not reveal any information to police. When petitioner's girlfriend, Michelle Hutchings, visited petitioner in jail, petitioner directed Hutchings to have Clifford "Joe" Hollingshead "interrogate" Davis "hard" to find out what Davis had told the police. Hutchings conveyed petitioner's request to Hollingshead. On February 23, 1998, Hollingshead's brother Todd and a friend forcibly entered Davis's house at 1:00 a.m, after breaking some glass. Several times after that Davis received pages with the notation "187," which is the California Penal Code Section for murder. (RT 394, 484, 744-45, 747, 491, 510-19.)

When he was in custody on May 27, 1998, Hollingshead gave an audiotaped police interview. On the audiotape admitted at trial, Hollingshead indicated that, on the night of the murder, petitioner never told Hollingshead that robbery had been the motive for the killing; Hollingshead just assumed so. Later on the tape, Hollingshead stated that petitioner had expressly told Hollingshead that the motive for the murder was that he intended to take property or money from Alvarado. Hollingshead stated that petitioner revealed that Alvarado had set up a meeting because petitioner owed Alvarado money, but petitioner went to the meeting with the intention of robbing Alvardo. Hollingshead recounted that petitioner stated that his attempt was a failure because he did not get anything. Hollingshead maintained his story during several subsequent interviews with the police. (RT at 784-86, 821, 849, 1015-17, 1018-21, 1042.)

Petitioner offered the following evidence at trial. Petitioner killed Alvarado in self-defense. On January 22, 1998, petitioner asked Alvarado, who had previously sold petitioner drugs, to come to petitioner's home so that petitioner could purchase drugs. When Alvarado arrived, he and petitioner argued over whether petitioner owed Alvarado money from previous drug transactions. During the dispute, petitioner was surprised when Alvarado pointed a gun at him. Alvarado forced petitioner to surrender $4,000 in currency, which petitioner was carrying to purchase drugs. However, even after petitioner turned over the cash, Alvarado

5

continued to point the gun at petitioner. Petitioner was frightened for his life and afraid to walk away; he attacked Alvarado and, in the ensuing struggle, shot Alvarado. (RT at 1380-87, 1396-1407, 1450, 1479, 1490-96.)

After shooting Alvarado, petitioner briefly considered suicide, but instead decided to spoliate the evidence of the crime. He tossed the gun over the fence into his yard because his fingerprints were on the gun. Then, to ensure that his home would not be identified as the killing site, petitioner moved Alvarado aside and drove Alvarado's vehicle to Prairie Elementary School, where he crashed it. After the crash, petitioner took his $4,000 and ran to Davis's home, where he confessed the killing and cleaned himself before Davis drove him to his own home and then to Hutchings's home. Petitioner discarded his jacket at Hutchings's home after telling Davis not to tell the police about his activities. Petitioner did not tell Davis that he tried to rob Alvarado; instead petitioner stated that he told Davis that he believed that Alvarado had suspected that he (petitioner) was trying to get out of paying Alvarado the money that petitioner owed him. Petitioner stated that, the next day, he told Davis to keep her mouth shut. Hutchings figured out that petitioner was involved in the killing of Alvarado later that night due to the strange way petitioner was behaving. At petitioner's direction, Hutchings called Davis's house to find out what Davis knew. (RT at 1409-20, 1433, 1527,1427-28.)

Petitioner stated that he did not tell Hollingshead he had committed the killing during a robbery attempt. The $4,000 which Hutchings delivered to petitioner's then-attorney Duree was an amount to be applied to a $20,000 fee for Duree to represent petitioner at the pre-trial hearing on the murder charge in this case. Although petitioner was in need of money on the night of the shooting, that need did not stem from a need to pay Duree legal fees. After paying Duree $300 on January 22, 1998, petitioner did not owe Duree any money. Petitioner testified that he would have to pay Duree substantial legal fees if he went to trial on the then-pending charges instead of agreeing to a plea bargain. Petitioner stated that he believed that, regardless of whether there was a plea bargain or a trial on his pending charges, he was going to go to jail

for a significant time, and he wanted to obtain money before being incarcerated.  (RT at 1211-13, 1388, 1148, 1152, 1466-67, 1471-72.)

## II.    STANDARD OF REVIEW

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. See Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  See Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

### III.   DISCUSSION

Petitioner first claims that he was denied his Sixth Amendment right to a fair trial and his Fourteenth Amendment right to due process when the state trial court permitted the prosecution to use witness statements that were coerced and involuntary during trial. This argument is essentially the same one which he presented to the California Court of Appeal. See Appellant's Opening Brief at 48-93.

In his amended petition, petitioner asserts that Stacie Davis, who was then sixteen, was verbally abused by police and deprived of minimal comforts during her interrogation. (Am. Pet. at 10). Davis cried throughout the interview, was threatened with jail, and was not allowed to have anyone in the room to provide her with support. (Id.) Petitioner asserts that Michelle Hutchings, who was then twenty-one, and Clifford "Joe" Hollingshead, were similarly coerced by threats into making statements. Petitioner argues that he has standing to assert that his own due process right to a fair trial was violated as a consequence of the violation of a third party's Fifth Amendment rights. (Id.)

At the onset the court notes that, to have standing to bring a claim, a proponent must assert his own legal rights and interests rather than basing his claim for relief on the rights of third parties. See Rakas v. Illinois, 439 U.S. 128, 139-40 (1978). Therefore, to the extent that petitioner is asserting that the violation of his rights flows from a violation of the rights of a third party, his claim must fail.

Petitioner contends that the admission of Davis's, Hutchings's and Hollingshead's testimony violated his right to due process, but has not pointed to any Supreme Court authority requiring the exclusion of these witness' testimony. This court's survey of Supreme Court precedent has not found anything steering this court to the result petitioner desires. A review of

the case law shows that the U.S. Supreme Court has condemned coerced confessions as violative of the Fifth and Fourteenth Amendments. See Blackburn v. Alabama, 361 U.S. 199, 206-07, 210 (1960). But there must be police misconduct causally related to the confession in order for the court to conclude that the confession was involuntary in violation of the Fourteenth Amendment's Due Process Clause. See Colorado v. Connelly, 479 U.S. 157, 167 (1986). However, this rule has not been extended to apply to third party confessions.

The U.S. Supreme Court has determined that due process is violated if a judge gives warnings that are so coercive or threatening that a defendant is deprived of a key witness on his behalf. See Webb v. Texas, 409 U.S. 95, 98 (1972). In Webb, the trial judge had given a lengthy warning to a witness in which the judge accused the witness of planning to commit perjury and threatened to put him in jail for a long time if he committed perjury; after hearing the warning, the defense witness declined to testify at all. Webb is distinguishable from petitioner's case in that in Webb, the coercion scared off a defense witness and impeded the defendant's ability to put on a defense. The facts in the present case are markedly different from Webb. None of the witnesses were intimidated from testifying for the defense.

Petitioner asserts that the statements of the three prosecution witnesses were coerced, but he has failed to offer any evidence that the alleged coercion had any impact on the substance of the testimony of any of the witnesses. See e.g. Webb, 409 U.S. 98. The complete absence of evidence that any of the techniques employed by police had any impact on the substance of any of the three witnesses' testimony convinces the court that no due process violation occurred. Petitioner states that coerced statements are "inherently unreliable," but his conclusory assertions are not enough. The only evidence in the record[2] is that the three witnesses were coerced into making statements; however nothing indicates that the content of the

---

[2] The parties to this litigation have stipulated that the tapes and transcripts of the interrogations of Davis, Hollingshead and Hutchings be made part of the record in this case and they have been lodged as such.

statements was coerced. Securing the testimony of Davis, Hutchings and Hollingshead by taking them into custody and threatening each with jail–while not the most desirable course of events, did not result in a due process violation because it did not lead any of the witnesses to testify any differently than they would have otherwise. Petitioner has failed to demonstrate that the introduction of Davis's, Hutchings's or Hollingshead's testimony rendered his trial fundamentally unfair. See Greer v. Miller, 483 U.S. 756, 765 (1987).

Petitioner's second claim is that he was subjected to prosecutorial misconduct. This claim is essentially the same claim that was presented to the California Court of Appeal. See Appellant's Opening Brief at 126-34. Specifically, petitioner claims that his Sixth and Fourteenth Amendment rights were violated when the prosecutor, over the objections of defense counsel, stated in his closing argument that John Duree, petitioner's former lawyer, accepted money "under the table" and did not declare all his income. Petitioner argues that this statement contradicted Duree's testimony for the defense that petitioner did not owe him any money. Petitioner also claims that this statement undermined petitioner's defense that he did not need money to pay his attorney and, therefore, had no motivation to rob Alvarado.

Success on a claim of prosecutorial misconduct requires a showing that the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. See Greer, 483 U.S. at 765. The conduct must be examined to determine "whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." United States v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990). Generally, if an error of constitutional magnitude is determined, a harmless error analysis ensues. Error is considered harmless if the court, after reviewing the entire trial record, decides that the alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993). Error is deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's substantial rights." Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).

Depending on the case, a prompt and effective admonishment of counsel or curative instruction from the trial judge may effectively "neutralize the damage" from the prosecutor's error. See U.S. v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at 806).

At the close of the evidence, the trial judge instructed the jurors that "you must determine what facts have been proved from the evidence received from trial." (RT at 1553.) The judge further stated that "statements made by attorneys during trial are not evidence." (Id.) Thereafter, during the his closing argument, the prosecutor stated:

> Now, Mr. Duree is upset because I did not take his word when he told me 'But my client didn't owe me any money.' Mr. Duree takes it very personally that I don't believe him. That I asked him to provide the records to prove it."

(RT at 1616.) The prosecutor went on to discuss that Duree's testimony showed that petitioner owed him around seven thousand five hundred dollars and that, under the Business and Professions Code, Duree would have been required to have a written retainer agreement with Petitioner but that Duree was not able to produce a written record. After an overruled objection, the prosecutor continued, stating that:

> If nothing else looking at the evidence that John Duree produced for us in his testimony in this case had to make you suspicious with how he runs his practice with a nineteen year old drug dealer anyway. Mr. Duree says he doesn't owe any money but he doesn't have a contract to prove it.... He has records to suggest that he was paid seventy-five hundred dollars, but we know that he represented Mr. Nolasco on three cases.

(RT 1618.) In concluding his argument, the prosecutor stated:

> Ladies and gentlemen, what I have described to you is what the evidence in this case shows, and that's what should be the basis for your verdict.

11

    You heard my argument and what the evidence proves and what your verdict should be on the evidence.

(RT 1626-27.)

    The record shows that petitioner himself presented evidence at trial which tended to show that he was in need of funds. Petitioner needed money on January 22, 1998 because the then-pending charges against him had not yet been resolved. Petitioner needed money to pay Duree if a trial rather than a plea bargain resulted from the pending charges. Next, petitioner was factually guilty on the pending charges and he expected a disposition–either through a plea or through a trial, which would send him to prison for several years. Petitioner wanted to obtain funds before, rather than after, he was incarcerated. (RT at 1211-13, 1388, 1148, 1152, 1466-67, 1471-72, 1500.) In light of this evidence, petitioner cannot show that the prosecutor's statements were "likely to have affected the jury's discharge of its duty to judge the evidence fairly."

See <u>Simtob</u>, 901 F.2d at 806. Petitioner has not shown that the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. See <u>Greer</u>, 483 U.S. at 765. Accordingly, the state court's rejection of this claim was reasonable.

    Petitioner's final argument is that the trial court erred when it instructed the jury that it could infer consciousness of guilt[3] on petitioner's part based upon testimony that petitioner

---

[3] The trial judge gave the jury a consciousness of guilt instruction pursuant to CALJIC No. 2.04, which reads "if you find that the defendant attempted to persuade a witness to testify falsely, attempted to fabricate evidence to be used at trial, or attempted to suppress evidence against himself in any manner, such as by intimidation of a witness or by destroying evidence, such conduct may be considered by you as circumstances tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt and its weight and significance are for you to decide."

had attempted to intimidate a witness.[4]  (Am. Pet. at 16.)  Petitioner presented this argument to the California Court of Appeal.  See Appellant's Opening Brief at 116-124.  Petitioner states that the jury instruction, coupled with petitioner's recorded statement to Hutchings, was "devastating to petitioner's case and rendered the trial unfair."

      A challenge to jury instructions does not generally state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  See  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980), cert. denied, 449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).

      In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

---

[4]Petitioner states in his amended petition "the trial [sic] committed constitutional error when, over defense objections, it instructed the jury that it could infer consciousness of guilt on petitioner's part based upon testimony that he attempted to intimidate a witness."  However, the transcript reveals that there was no objection to the jury instruction. (RT at 1559, Appellant's Opening Brief at 119, 125.)  It appears that defense counsel objected to the introduction of a taped conversation between petitioner and Michelle Hutchings in which petitioner suggested that Clifford "Joe" Hollingshead intimidate Stacie Davis and to the introduction of evidence that Todd Hollingshead, Joe's brother, broke into Davis's house.

(9th Cir. 1988), cert. denied, 488 U.S. 861 (1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984), cert. denied, 469 U.S. 838 (1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).

> Here, the only evidence petitioner presents that the jury instruction "so infected the entire trial that the resulting conviction violate[d] due process" is his conclusory statement. The evidence, taken as a whole, reveals that petitioner repeatedly personally told Stacie Davis not to reveal what she knew.  (RT at 394, 439, 484, 1420, 1422-23.)  The record establishes that petitioner directed Michelle Hutchings to have Davis intimidated and, by his own admission, silenced.  (RT at 744-45, 1450.)  The record also shows that petitioner attempted to spoil the evidence against him by disposing of the murder weapon in his yard, throwing away his coat at his girlfriend, Michelle Hutchings's residence and moving Alvarado's Jeep from petitioner's home.  (RT at 420, 1410-12.)  The challenged jury instruction did not refer specifically to the jury inferring a consciousness of guilt based on the conduct of Hollingshead's brother Todd, but instead generally referred to any evidence that petitioner was trying to suppress evidence against him. In light of the record as a whole, the court finds that the challenged jury instruction did not

violate petitioner's right to due process.

IV.   CONCLUSION

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, petitioner may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Petitioner is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  March 7, 2006.

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE